# IN THE CIRCUIT COURT FOR COCKE COUNTY, TENNESSEE

GIRGUIT COURT
FILED

DEC 28 2010

PEGGY W. LANE
CIRCUIT COURT CLER
Cocke County, TN

BEVILLE H. REAGAN, individually, and on
behalf of all others similarly situated,

    Plaintiff,

v.

ARCELORMTTAL;
ARCELORMITTAL USA, INC.;
UNITED STATES STEEL CORPORATION;
NUCOR CORPORATION;
GERDAU AMERISTEEL US INC.;
STEEL DYNAMICS, INC.;
AK STEEL CORPORATION;
SSAB SWEDISH STEEL CORPORATION;
COMMERCIAL METALS COMPANY,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

NO. 32,321 -

**CLASS ACTION**

STATE OF TENNESSEE, COCKE COUNTY
I, Peggy W. Lane, Clerk of the Circuit Court of
Cocke County, Tennessee, certify that the foregoing
is a true copy of the original bill filed in this cause.
Witness my hand and official seal of office on this
28th day of December ,2010
Peggy W. Lane
Circuit Court Clerk

---

## CLASS ACTION COMPLAINT

---

  **NOW INTO COURT** comes the Plaintiff, Beville H. Reagan ("Plaintiff"), by the

undersigned attorneys, individually and on behalf of all others similarly situated, and brings this

action for damages and restitution pursuant to Tennessee law.

  This Complaint is alleged upon information and belief, except as to those allegations

pertaining to the named Plaintiff, which are alleged on his personal knowledge.

## I.  NATURE OF THE ACTION

  1.  This suit is brought by Plaintiff as a class action, pursuant to Tennessee Rule of Civil

Procedure 23, on behalf of a class consisting of all persons and entities who purchased steel products

indirectly from Defendants between January 1, 2005 and the present (the "Class Period") in the State

of Tennessee.

**EXHIBIT A**

2.     The gravamen of this action is that Defendants conspired to fix, raise, maintain and stabilize the price at which steel products imported into the State of Tennessee were sold in Tennessee during the Class Period. The mechanics of Defendants' conspiracy included a scheme designed to, and which had the effect of, artificially-restricting the supply of steel products in Tennessee, thereby allowing Defendants to charge supra-competitive prices.

3.     Throughout the Class Period, Defendants met with each other to discuss the need to impose industry production "discipline" and to "adjust their production rates so the price of steel doesn't drop." These and other calls to arms and pledges by and between Defendants were followed with action: massive, coordinated and unprecedented market downtime, *i.e.*, idling and/or reducing production of steel products. By acting in concert pursuant to their conspiracy, Defendants removed substantial amounts of steel products from the market, which caused prices artificially to rise.

4.     The impact on the Class has been and continues to be substantial. As a result of "being squeezed by the steel mills' market domination and shortening of supply," indirect purchasers of steel paid substantially more for steel products during the conspiracy period than they would have paid in a competitive market.

## II.    JURISDICTION AND VENUE

5.     This class action is brought under Tennessee law. Plaintiff asserts no claim under the laws of the United States. The amount in controversy as to Plaintiff and each individual member of the Proposed Class does not exceed Seventy-Four Thousand Nine-Hundred Ninety-Nine Dollars ($74,999.00) each, exclusive of interest and costs; and Plaintiff disclaims compensatory damages, punitive damages, declaratory, injunctive, equitable or other damages or relief greater than Seventy-Four Thousand Nine-Hundred Ninety-Nine Dollars ($74,999.00) per individual Class

member.  Further, Plaintiff and members of the proposed Class limit their aggregate class-wide claims for relief to less than Four Million Nine-Hundred Ninety-Nine Thousand Nine Hundred Ninety-Nine Dollars ($4,999,999.00) and specifically disclaim compensatory damages, punitive damages, disgorgement, declaratory, injunctive, equitable or other damages or other relief greater than Four-Million Nine-Hundred Ninety-Nine-Thousand Nine-Hundred Ninety-Nine Dollars ($4,999,999.00).

6.      Venue is proper in Cocke County, where Plaintiff's claim arose.  Tenn. Code Ann. §20-4-101.  A substantial part of Plaintiff's harm arose in Cocke County.

7.      Further, Defendants (directly or through agents who were at the time acting with actual and/or apparent authority and within the scope of such authority) have:

> (a) transacted business in Tennessee;
>
> (b) intentionally availed themselves of the benefits of doing business in Tennessee;
>
> (c)  caused tortious damage by act or omission in Tennessee;
>
> (d) committed acts and omissions that Defendants knew or should have known would cause damage in Tennessee.

## III.   PARTIES

8.      Plaintiff is a citizen and resident of Sevier County, Tennessee.  During the Class Period, Plaintiff purchased steel products indirectly from one or more of the Defendants.

9.      Defendant ArcelorMittal ("Mittal" or "Mittal Steel") is a Luxembourg corporation with its principal place of business at 19 Avenue de la Liberte, L-2930, Luxembourg, Grand Duchy of Luxembourg.  Defendant ArcelorMittal, formerly known as Mittal Steel Company N.V. and/or as Ispat International N.V., has extensive operations in the United States, either directly or through

-3-

its wholly-owned and controlled subsidiaries and affiliates. During the Class Period, ArcelorMittal and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold steel products indirectly to purchasers in Tennessee.

10.     Defendant ArcelorMittal USA, Inc. ("Mittal" or "Mittal Steel") is the principal United States operating subsidiary of ArcelorMittal. ArcelorMittal USA, Inc. is a wholly-owned subsidiary of ArcelorMittal with its principal place of business at 1 South Dearborn, Chicago, IL 60603. ArcelorMittal USA is the successor of the following relevant entities: International Steel Group, Inc.; Mittal Steel USA ISG, Inc.; Ispat Inland; and Mittal Steel USA, Inc. During the Class Period, ArcelorMittal USA and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold steel products indirectly to purchasers in the State of Tennessee.

11.     Defendant United States Steel Corporation ("U.S. Steel") is a Delaware corporation with its principal place of business at 600 Grant Street, Pittsburgh, Pennsylvania 15219. During the Class Period, U.S. Steel and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold steel products indirectly to purchasers in the State of Tennessee.

12.     Defendant Nucor Corporation ("Nucor") is a Delaware corporation with its principal place of business at 1915 Rexford Road, Charlotte, North Carolina 28211. During the Class Period, Nucor and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold steel products indirectly to purchasers in the State of Tennessee.

13.     Defendant Gerdau Ameristeel US Inc. ("Gerdau Ameristeel") is a Canadian corporation with its principal place of business at 4221 West Boy Scout Boulevard, Suite 600,

-4-

Tampa, Florida 33607. During the Class Period, Gerdau Ameristeel and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold steel products indirectly to purchasers in the State of Tennessee.

14.     Defendant Steel Dynamics, Inc. ("Steel Dynamics") is an Indiana corporation with its principal place of business at 6714 Pointe Inverness Way, Suite 200, Fort Wayne, Indiana 46804. During the Class Period, Steel Dynamics and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold steel products indirectly to purchasers in the State of Tennessee.

15.     Defendant AK Steel Corporation ("AK Steel") is a Delaware corporation with its principal place of business at 9227 Centre Point Drive, West Chester, Ohio 45069. During the Class Period, AK Steel and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold steel products indirectly to purchasers in the State of Tennessee.

16.     Defendant SSAB Swedish Steel Corporation ("SSAB") is a Swedish corporation headquartered in Stockholm, Sweden, with its principal North American place of business at 650 Warrenville Road, Suite 500, Lisle, Illinois 60532. SSAB is the successor of IPSCO, Inc. ("IPSCO"). During the Class Period, SSAB and IPSCO and/or their predecessors, wholly-owned or controlled subsidiaries or affiliates sold steel products indirectly to purchasers in the State of Tennessee.

17.     Defendant Commercial Metals Company ("Commercial Metals") is a Delaware corporation with its principal place of business at 6565 MacArthur Boulevard, Irving, Texas 75039. During the Class Period, Commercial Metals and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold steel products indirectly to purchasers in the State of Tennessee.

-5-

## IV. CO-CONSPIRATORS

18.     Various other persons, firms and corporations, not named herein as Defendants, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.

19.     In this Complaint, whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

## V. CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action on behalf of himself and a class of persons under the provisions of Rule 23.01, 23.02(2) and 23.02(3) of the Tennessee Rules of Civil Procedure. The Class is defined as follows:

> All persons in the State of Tennessee who purchased steel products indirectly from any of the Defendants or their subsidiaries or affiliates at any time from at least as early as January 2005 until the Present.

> Excluded from the Class are Defendants, entities in which Defendants have a controlling interest, Defendants' employees, officers, or directors, Defendants' legal representatives, successors, or assigns, judicial officers who may hear the case or related persons, and jurors or related persons.

21.     For purposes of this Complaint, steel products include all products derived from raw steel and sold by Defendants, including, but not limited to, steel sheet and coil products; galvanized sheet and other galvanized and/or coated steel products; tin mill products; steel slabs and plates; steel

-6-

beams, blooms, rails, and other structural shapes; steel billets, bars, and rods; steel pipe and other tubular products; and all other products derived from raw steel and sold by Defendants.

22.     The persons in the proposed Class are so numerous and geographically dispersed that individual joinder of all members is impracticable under the circumstances of this case. Although the precise number of such persons is unknown, Plaintiff believes that there are many thousands of Class members.

23.     There are questions of law and fact common to the Class, including:

   a.   Whether Defendants and their Co-Conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize prices of steel products sold in the State of Tennessee;

   b.   The duration of the conspiracy alleged herein and the acts by Defendants and their Co-Conspirators in furtherance of the conspiracy;

   c.   Whether the alleged conspiracy violated the Tennessee Trade Practices Act, Tenn. Code Ann. §47-25-101 et seq;

   d.   Whether the conduct of Defendants and their Co-Conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiff and the other members of the Class;

   e.   The effect of Defendants' conspiracy on the prices of steel products sold in the State of Tennessee during the Class Period; and

   f.   The appropriate class-wide measure of damages.

24.     Plaintiff is a member of the Class. Plaintiffs claims are typical of the Class' claim, as they arise out of the same course of conduct and the same legal theories as the rest of the Class,

-7-

and Plaintiff challenges the practices and course of conduct engaged in by Defendants with respect to the Class as a whole. Plaintiff is an indirect purchaser of steel products and his interests are aligned with, and not antagonistic to, those of the other members of the Class.

25.     Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained class counsel who is competent and experienced in the prosecution of lawsuits under the Tennessee Trade Practices Act and class action litigation in general.

26.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

27.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

28.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This class action presents no difficulties in management that would preclude maintenance as a class action.

## VI.    TRADE AND INTERSTATE COMMERCE

29.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected trade and commerce in the State of Tennessee.

-8-

30. During the time period covered by this Complaint. Defendants manufactured. sold and/or distributed steel products, directly or indirectly, in the State of Tennessee.

31. During the Class Period, Defendants and their Co-Conspirators manufactured, sold and shipped substantial quantities of steel products which were indirectly purchased by Tennessee consumers.

32. The conspiracy in which the Defendants and their Co-Conspirators participated had a direct, substantial, and reasonably foreseeable effect on Tennessee commerce.

## VII. BACKGROUND FACTS

33. Steel is one of the largest commodity markets in the United States, comprising approximately 105 million tons of annual domestic raw steel production and at least $80 billion in annual domestic sales by United States producers.

34. The core product in the steel industry is "raw steel," a commodity good that is the primary input for a variety of steel products manufactured and sold by the Defendants, including, *inter a/ia*, flat steel sheets and coils; galvanized steel products; tin mill products; steel plates; steel beams, rails and other structural shapes; steel bars and rods; steel wire and wire rod; steel pipes and other tubular products; and a variety of other products derived from raw steel.

35. These and other steel products are used by, *inter alia*, direct purchasers in the auto manufacturing industry; the equipment, shipbuilding, railcar and appliance manufacturing industries; the container manufacturing industry; construction industry; the oil and gas industry; and the steel fabrication industry.

36. The price of steel products sold in the State of Tennessee is impacted directly by the production, supply, and price of raw steel.

37.     Raw steel is manufactured in the United States primarily by two methods: (1) the basic oxygen furnace and (2) the electric arc furnace.

38.     Basic oxygen furnaces are operated by so-called "integrated" steel producers. In broad terms, integrated steel production entails combining iron ore, limestone, and coke (a fuel derived from coal) in a large "blast furnace," which produces molten iron. Iron produced in this manner is then transferred to a basic oxygen furnace, where it is combined with other elements and purified with oxygen to create usable raw steel.

39.     Defendant ArcelorMittal is the largest integrated steel producer in the United States, controlling approximately 20-25% of total domestic raw steel capacity during the conspiracy period.

40.     Defendant U.S. Steel is the second largest integrated steel producer in the United States, controlling approximately 16% of total domestic raw steel capacity.

41.     The alternative method of raw steel production, the electric arc furnace, functions principally by recycling scrap. Electric arc production – also known as "minimill" production – entails melting steel scrap and other inputs in an electric arc furnace and reconstituting the materials into usable raw steel.

42.     Defendant Nucor is the largest electric arc ("minimill") producer in the United States, controlling approximately 21% of total domestic raw steel capacity.

43.     Other major United States steel producers include Defendants Gerdau Ameristeel, AK Steel, Steel Dynamics, IPSCO, and Commercial Metals, which control approximately 10%, 5%, 4%, 2.5%, and 2% of total domestic raw steel capacity, respectively.

44.     Collectively, Defendants control approximately 80-85% of domestic raw steel capacity.

-10-

45. Steel production was sufficiently concentrated in the United States market such that collusion among Defendants was feasible throughout the conspiracy period.

46. Steel production is capital intensive and is characterized by costly and lengthy new entry, including new mill construction and startup costs that typically exceed $1 billion.

47. In addition, steel production is subject to federal environmental laws and regulations, and is insulated from foreign competition by, *inter alia*, significant transportation costs (including ocean freight rates) and trade barriers (including import duties).

## VIII. VIOLATIONS ALLEGED

48. Beginning as early as 2005 until the present, the exact dates being unknown to Plaintiff, Defendants and their Co-Conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of steel products in the State of Tennessee in unreasonable restraint of trade and commerce, in violation of Tenn. Code Ann. § 47-25-101 et seq.

49. The combination and conspiracy consisted of an agreement among the Defendants and their Co-Conspirators, the substantial terms of which were to restrict output and to fix, raise, stabilize and maintain at artificially high levels the prices they charged for steel products.

50. The conspiracy began following a dramatic period of restructuring in the domestic steel industry. Between 2000 and 2004, a series of bankruptcies, mergers, and acquisitions consolidated what previously had been a fragmented market. Defendants Mittal Steel, U.S. Steel and Nucor emerged from this period as the dominant domestic producers, together controlling over 55% of domestic raw steel capacity.

51. The industry's rapid consolidation coincided with strong demand, prices, and earnings through mid-2004, before pricing began to decline in the latter part of the year.

-11-

52.     In early-2005, market leader Mittal Steel USA – the largest domestic producer and a predecessor of Defendant ArcelorMittal USA – recognized the need for improved industry "discipline" to improve prices and profits.

53.     In particular, senior Mittal Steel executives believed that the industry should limit its total output in an effort to reduce supply and inflate the price of steel.

54.     On February 11,2005, Lakshmi Mittal, chairman of Mittal Steel, explained his company's strategy: "Mr. Mittal said the growing consolidation in the sector, led by his group, had led to a greater focus on profitability, making companies more likely to cut output than prices in any downturn."

55.     Mittal Steel knew that it could not control the price of steel in the United States unilaterally, and knew that price and supply stabilization required coordinated action from other major producers. To that end, senior Mittal executives conspired with other Defendants to limit the industry's total production and output.

56.     On March 1, 2005, Mittal Steel USA executive Louis Schorsch addressed a steel industry meeting in Chicago and criticized the industry's traditional business model, which "ensured that most producers would cut price before reducing volume." According to Mr. Schorsch, 2004-2005 was a "watershed" period marking "the resolution of many of these structural issues" because "consolidation has improved the industry structure and should ultimately lead to better conduct and therefore better performance." Mr. Schorsch continued: "Ultimately, if we are going to see improved conduct and thus improved performance, it will only be because the consolidation we have undergone encourages a change in behavior to match the industry structure. This means an emphasis

-12-

on value instead of just cost, a focus on profits rather than tons, and an ability to manage strategically rather than just for the short term."

57.     Mr. Schorsch concluded by calling on the industry to "respond to market fluctuations" with "adjustments in operating rates." In response to falling prices, Mr. Schorsch asked other producers to avoid "an inevitable 'race to the bottom," and to instead cut production at "marginal facilities."

58.     On May 9, 2005, Malay Mukherjee, COO of Mittal Steel, U.S. Steel CEO John Surma, Nucor CEO Dan DiMicco, and Gerdau Ameristeel CEO Phillip Casey met at the Association for Iron and Steel Technology ("AIST") in Charlotte, North Carolina.

59.     At that meeting, Mr. Mukherjee explained that "what is needed from the industry is a disciplined approach to bringing on supply and managing capacity." According to Mr. Mukherjee, such production discipline would lead to "more stable price levels and a financially healthier industry overall."

60.     One week later, on May 6-17, 2005, steel executives convened in Washington, DC, for an annual meeting of the American Iron and Steel Institute ("AISI"), a trade association whose members include Defendants ArcelorMittal, U.S. Steel, Nucor, AK Steel and Steel Dynamics and whose past Chairmen include Mittal Steel USA CEO Louis Schorsch, U.S. Steel CEO John Surma, Nucor CEO Dan DiMicco, and the former CEO of IPSCO, David Sutherland.

61.     Immediately after this series of executive-level contacts and discussions concerning the need to limit industry output, Mittal Steel and U.S. Steel curtailed several domestic blast furnaces in May 2005 for the express purpose of reducing the market supply of steel.

-13-

62.    Approximately one month later, on June 20-22, 2005, executives from the major producers convened again in New York for a trade conference known as Steel Success Strategies. According to the CEO of ArcelorMittal, Steel Success Strategies brings together "the most influential stakeholders in the steel industry today . . . . this event [is] a must-attend for anyone involved in the industry."

63.    Attendees at the June 2005 Steel Success Strategies conference included, *inter alia*, Lakshmi Mittal, Chairman and CEO of Mittal Steel; Louis Schorsch, CEO of Mittal Steel USA; Daniel R. DiMicco, Vice Chairman, President and CEO of Nucor; Phillip E. Casey, Chairman and CEO of Gerdau Ameristeel; Keith Busse, President and CEO of Steel Dynamics, Inc.; James L. Wainscott, President and CEO of AK Steel; David Sutherland, President and CEO of IPSCO; and executives and/or senior managers from Defendants U.S. Steel and Commercial Metals.

64.    During the June 2005 Steel Success Strategies conference, "industry leaders discussed at length the changes the industry has gone through in the past 12-18 months – especially the impact of consolidation and its ability to bring newfound discipline to what traditionally has been an unruly market." Industry executives including Mittal Steel USA CEO Louis Schorsch "made the point that steel's resurgence in demand and profitability during the past 18 months can be sustained – but only if capacity and production are brought under control now."

65.    At the same 2005 Steel Success Strategies conference, Phillip Casey, chairman and CEO of Gerdau Ameristeel Corp., "urged that it's time for the industry to take advantage of the lessons learned from the recent wave of consolidation." Mr. Casey elaborated:

> We have demonstrated the advantages of market discipline, accelerated supply responsiveness, improved asset utilization, an improved network ability to exchange operating knowledge and best

-14-

operating practices, and an improved capital structure. I think all these will improve the stability of our industry. We can take advantage of the education we have received and learn from it, and will find that fewer players and tighter metallics will be beneficial for the overall industry.

66.     At the same 2005 Steel Success Strategies conference, Mittal Steel USA CEO Louis Schorsch cautioned the industry against "growing supply."

67.     In addition, Mittal Steel CEO Lakshmi Mittal explained at the conference that: "Today's softening of the market is not due to a sudden drop in demand but due to an inventory overhang situation created in the market." According to Mr. Mittal, "[t]his situation can be better dealt with through consolidation of the industry. Consolidation will lead to *companies adjusting production levels* to ensure that the inventory corrects itself and the state of equilibrium is re-established. Thus if we as an industry can understand this phenomena we will be able to build more sustainability in our operations." (emphasis added).

68.     In addition to the meetings recounted above, CEOs including Lakshmi Mittal from ArcelorMittal, John Surma from U.S. Steel, and Dan DiMicco from Nucor typically met quarterly during 2004-2005 and beyond as members of the executive committee of the International Iron and Steel Institute ("IISI"), a trade group comprised of President and CEO-level executives from the world's largest steel producers.

69.     Defendants discussed capacity and output at these IISI functions, including an executive meeting in 2005 at which Nucor CEO Dan DiMicco cautioned the industry against oversupplying the market.

70.     In mid-2005, immediately after this series of high-level discussions and agreements regarding supply, the major domestic steel producers took unprecedented and cooperative action.

-15-

For example, Mittal Steel USA – the largest United States producer and predecessor of Defendants ArcelorMittal and ArcelorMittal USA – substantially curtailed production at several of its United States mills in the second quarter of 2005.

71.    As of June 29, 2005 – one week after the trade meeting at which Lakshmi Mittal explicitly called on the industry to "adjust[] operating levels" – Mittal Steel USA had closed five of its twelve United States blast furnaces, was operating other mills at reduced rates, and had announced that it would extend its North American production curtailments into the third quarter of 2005. According to Mittal, its objective in taking downtime was to remove supply from the marketplace.

72.    In July 2005, Mittal Steel USA operated its United States mills at only 55% of available capacity.

73.    According to Lakshmi Mittal, Mittal Steel was the "[f]irst steel company to announce production cutbacks, of one million tons, for third-quarter 2005, maintaining reduced production levels from the second quarter."

74.    The second largest domestic integrated producer, U.S. Steel, cut production simultaneously by reducing its United States operating rate from approximately 90% in the first quarter of 2005 to approximately 75% in the second quarter of 2005.

75.    U.S. Steel closed at least two of its twelve United States blast furnaces in the second quarter of 2005 for the express purpose of reducing the market supply of steel. In addition, U.S. Steel decreased production at several other facilities.

-16-

76.     U.S. Steel extended its curtailment through the third quarter of 2005, when it operated its United States mills at only 72% of capacity. U.S. Steel again stated that it had cut production to limit supply.

77.     In response to the mid-2005 curtailments from Mittal and U.S. Steel, industry experts remarked that "the degree to which integrated producers cut back is really unprecedented."

78.     Nucor, the largest United States minimill producer, followed suit, announcing downtime on June 28, 2005, contemporaneous with downtime announcements from its major competitors and only one week after the Steel Success Strategies trade meeting. Ultimately, Nucor operated its United States mills at only 79% of capacity in the second quarter of 2005 and only 81% of capacity in the third quarter of 2005. By comparison, Nucor operated its mills at approximately 96% of capacity in 2004.

79.     Nucor explained that, along with other steel producers, it cut production in mid-2005 "to generate a reasonable profit per ton of steel sold."

80.     Steel Dynamics, inc., another large minimill producer, participated in the industry's mid-2005 downtime.

81.     In July 2005, Steel Dynamics CEO Keith Busse explained that industry supply discipline had stabilized the price of steel: "You had supply-side cutbacks with what we did and the blast furnaces that took some production out. . . . Those kinds of things have led to a stronger market." According to the trade press, "Busse said that discipline by the mills earlier this year helped stabilize prices. . . He said his mill and others could have moved tons at lower numbers, but chose to reduce production to bring supply and demand more into balance." According to Mr. Busse, producers imposed "a discipline . . . that didn't exist 10 years ago."

-17-

82.     Beginning in May 2005, Gerdau Ameristeel locked out workers for six months at a mill in Beaumont, Texas, and also curtailed at least one of its mills for two weeks in July and August 2005.

83.     Gerdau Ameristeel CEO Phillip Casey explained that prices stabilized in mid-2005 due to "better discipline in the market from the producers in terms of adjusting the supply." According to Mr. Casey, the industry's "consolidated producer base react[ed] with more discipline than you would have seen at any time in the past."

84.     On or about June 28, 2005, Defendant Commercial Metals joined its major competitors in announcing market-related downtime at three United States mills.

85.     Summarizing the remarkable mid-2005 period of industry-wide downtime, the trade press reported on July 20, 2005, that "U.S. steel producers appear to be sticking to their pledges to reduce production" in an effort to restrict supply.

86.     An experienced market analyst surveyed the industry's mid-2005 downtime and reported having "never seen such a rapid drop in output. . . clearly this is unprecedented in our 30-year history analyzing this sector."

87.     Similarly, the trade press reported that, "In 2005, many U.S. mills, led to some degree by U.S. Steel, Mittal and Nucor, scaled back production when springtime service center inventory levels were high. The production cutbacks . . . had the effect of stabilizing pricing, in years past, mills often cut prices to move tons when service center inventories reached similar levels. The mills trumpeted the success of 2005 as evidence of their newfound business strategy and market discipline."

-18-

88.     The mid-2005 industry-wide curtailments were against Defendants' individual competitive interest in that, at all relevant times, the prevailing market price of steel was substantially higher than Defendants' marginal cost of production. In other words, at all relevant times, Defendants could have produced and sold steel products at a significant operating profit rather than taking costly market downtime at their mills.

89.     Mill shutdowns are costly because production and revenue are lost while the mill's fixed costs – including facility, labor, maintenance and other overhead costs – remain, in a competitive marketplace, Defendants would have operated their mills at a profit, and competed with each other for market share, rather than incurring these significant downtime costs.

90.     Defendants' coordinated mid-2005 mill shutdowns did not represent a competitive unilateral business strategy because no domestic steel producer enjoyed sufficient market power to control the price of steel unilaterally. To the contrary, as a Mittal Steel executive explained, the participation of other producers was necessary and played an "important" role in reducing supply and stabilizing the market.

91.     In addition, at all relevant times, annual domestic demand for steel far exceeded the United States production capacity of Defendants and other domestic producers. In other words, Defendants' industry-wide shutdowns cannot be explained by lack of demand.

92.     Indeed, at all relevant times during the conspiracy period, there was a structural *shortage* of steel in the United States market. According to data published by the AISI trade association, annual domestic demand for steel significantly exceeded domestic production during every year of the conspiracy period. Defendants' cooperative downtime exacerbated this supply shortage, squeezing the market and inflating the prevailing market price of steel.

-19-

93.     As alleged *infra*, domestic manufacturers and other steel purchasers experienced shortages and volume restrictions resulting from the industry's mid-2005 downtime.

94.     Defendants' strikingly coordinated mid-2005 downtime – implemented on the heels of public and private meetings concerning the need for industry-wide supply "discipline," at a time when no producer could control the price of steel unilaterally, when domestic demand for steel exceeded domestic supply, and when, absent collusion, production and competition would have been more profitable than costly mill shutdowns – is evidence of an agreement among Defendants to drive up prices by artificially reducing the market supply of steel.

95.     By working together to limit production on an industry-wide basis, Defendants were able to restrict the domestic supply of steel and artificially inflate its price.

96.     Defendants' coordinated output restraints had their intended impact on the market price of steel.

97.     After the industry's mid-2005 downtime, the benchmark price of hot rolled steel sheet increased by approximately 25%, *i.e.*, from approximately $440 in July 2005 to approximately $560 in September 2005.

98.     Mittal Steel explained that the industry's mid-2005 production curtailments "led to price stabilisation in August" 2005 and that "Prices are stabilizing. That is why producers are announcing price increases."

99.     In August 2005, the trade press reported on price increases imposed by U.S. Steel, Nucor, Steel Dynamics and others. According to these reports, "Steel producers cut back production during the first half of the year to bring steel supplies more in line with demand, leading to recent price stabilization[.]"

-20-

100. Similarly, Mittal Steel reported in November 2005 that "cuts in production have enabled a significant price recovery over recent months."

101. Confirming the direct price impact of the industry's mid-2005 production curtailment, Nucor Executive Vice President Joe Rutkowski explained that "companies decided to curtail production to prop prices up."

102. As summarized in Mittal's 2005 annual report, "We saw major players in both North America and Europe reducing production to address the challenges presented by the market. These actions contributed to reducing the inventory overhang, resulting in a price recovery in the latter part of 2005, a trend that has continued into this year."

103. Similarly, Mittal Steel explained that the industry-wide "cuts in production prove the industry's new focus is shareholder value."

104. Lakshmi Mittal praised both Mittal's leadership and the industry's collective supply discipline: "When the market were soft in 2005 Q2 and Q3 [sic], Mittal Steel and Arcelor has been clearly the leader who has cut production and that really shows the resilience of the steel industry, that shows that the industry is becoming much more sustainable than before." According to Mr. Mittal, "we have seen that the industry stood on its feet through the challenges and the industry has recovered . . . . The companies want to produce results to the shareholders, and I think that they will be ready to cut production, if required[.]"

105. In November 2005, Mr. Mittal praised "the behavior of the steel companies and they seem to be behaving very well with following the production side and trying to maintain the supply

demand balance. . . . we have seen the inventory buildup last year and since then the producers have been very cautious and careful in oversupply to the market and we believe that that inventory buildup will not take place in the Americas."

106. The industry's production "discipline" came at the expense of the domestic manufacturing sector and other direct purchasers of steel, which suffered from supply shortages caused by the Defendants' coordinated downtime. Contrary to Defendants' assertions in the trade press that "oversupply" somehow justified their downtime – a market condition that, in any event, would not justify' forming a cartel – the domestic market in fact was under-supplied during the conspiracy period.

107. As Steel Dynamics CEO Keith Busse has explained, the United States market is fundamentally "steel short" and "we have to remember we are still undersupplied, not oversupplied over here."

108. Defendants' coordinated downtime exacerbated that supply shortage. As a Toyota representative testified in 2006 proceedings before the United States International Trade Commission ("ITC"), "for the first time in my 19 plus years working for Toyota, when we approached [steel] suppliers [in 2005] and told them that. . . we were able to increase some of our volumes . . . we were met with no, we can't support that."

109. According to the Toyota representative, the steel industry's production restrictions caused a situation in which "two of our suppliers, citing capacity constraints, effectively imposed a maximum volume commitment that is lower than the volume we sought."

110. Similarly, a Chrysler representative testified in October 2006 that, "we at the Chrysler group have had consistent and increasing shortages recently of products for, actually for committed

-22-

tons. I get calls every Saturday, that famous Friday night call or Saturday morning call, the plant's running and we don't have our steel here. It happens throughout the week more frequently than we would like to have to deal with .... it started in earnest about a year ago and it's gotten progressively worse."

111.    After the steel industry's initial round of coordinated downtime in mid-2005, a purchasing manager for General Motors reported that the resulting supply "shortages became sufficiently critical around the third quarter of '05 that we had to assemble a crisis center."

112.    Likewise, a brief submitted to the ITC by the Motor and Equipment Manufacturers Association and the Precision Metalforming Association stated that "23 out of 31 purchasers reported problems with supply, including being placed on allocation or controlled order entry, and that such supply shortages have continued into 2006[.]" The steel purchasers' brief emphasized that "supply problems are ongoing"; that "U.S. steel producers are still unable to supply all of U.S. steel consumers' requirements"; and that "there is a fundamental deficit in the domestic industry's ability to supply U.S. demand."

113.    Other steel customers reported major supply disruptions and being placed on supply "allocation" during the conspiracy period.

114.    These supply shortages were caused and/or exacerbated by the domestic industry's unprecedented and collusive downtime in mid-2005 and other subsequent periods.

115.    After the industry's mid-2005 downtime, prices remained high and the market remained extremely profitable for producers through mid-2006.

-23-

116.    On February 23, 2006, Mittal Steel CEO Lakshmi Mittal explained that:

"The industry has changed immensely. . . there is a new discipline in
the industry which means when demand is soft, as happened in the
second quarter of 2005, companies cut production to better manage
supply/demand."

117.    Mr. Mittal congratulated the industry for its discipline in early-2006, stating:

I first spoke publicly about the need for consolidation in the steel
industry in 1998 . . . . The industry had long been associated with
cyclicality, volatility and an inability to adjust supply to global
demand. The result was some of the lowest valuations of any sector
of the stock market. Fast forward eight years and thankfully the
dynamics are changing. The benefits of a more global, consolidated
market are understood and supported. Considerable consolidation has
taken place, most notably in Europe, the U.S. and Japan. A number
of multinational companies have been created. The industry is less
volume-focused and has built enough scale and scope to be able to
curtail production in times of overcapacity or weak demand. We
have had a number of consecutive years of impressive profitability.

118.    Industry analysts were equally impressed, and praised "the significant supply

discipline for an industry that never had any discipline."

119.    On May 7-9, 2006, executives including Louis Schorsch, CEO of Mittal Steel USA;

John Surma, CEO of U.S. Steel; and Dan DiMicco, CEO of Nucor gathered in Boca Raton, Florida,

for the annual meeting of the AISI trade organization, of which Mr. Schorsch served as Chairman.

120.    The following month, Lakshmi Mittal, CEO of Mittal, explained that "definitely

industry has been watchful and inventory levels are in control, and we believe that industry will

remain watchful, and they will be proactive whenever they see that the market is softening[.]"

121.    In August 2006, Mr. Mittal explained that "going forward the industry is getting

geared to adjust their production and volume to maintain the prices. They should not be

oversupplying the market. Industry has become very conscious and careful on their inventory levels

-24-

and industry has shown in the last one and a half years that whenever there has been higher inventory levels, the industry has announced production cuts. And so is the policy of ArcelorMittal .... and we will continue with this policy because both the company and the industry believes in maintaining the price to return adequate returns to the shareholder."

122.    Mr. Mittal's repeated statements to this effect – praising *industry-wide* supply discipline and predicting future *industry* downtime – are evidence of an understanding and agreement among Defendants.

123.    The pattern would repeat itself in late-2006: When steel prices began to decline, the major United States producers intervened with remarkably coordinated downtime.

124.    Indeed, soon after Mr. Mittal's August 2006 prediction that "the industry is getting geared to adjust their production and volume to maintain the prices," a purchasing manager for General Motors, one of the largest domestic purchasers of steel, stated that a "major, integrated steel producer" had threatened to cut production rather than accept lower prices.

125.    From October 1-3, 2006, senior executives from the world's major steel producers convened in Buenos Aires, Argentina, for the annual conference of the IISI. Executive committee members of the IISI included CEO Lakshmi Mittal of ArcelorMittal, CEO John Surma from U.S. Steel and CEO Dan DiMicco from Nucor.

126.    According to accounts from the October 2006 IISI meeting in Buenos Aires, despite the expectation of strong demand in the near-term, the major steel producers explicitly urged production restraint and holding the line on capacity.

-25-

127.    On or about October 6, 2006, immediately after that meeting, ArcelorMittal announced the indefinite shutdown of two United States blast furnaces for the purpose of limiting supply.

128.    Contemporaneously, on or about October 4, 2006, U.S. Steel closed a blast furnace in Illinois.

129.    On or about October 9, 2006, U.S. Steel closed another blast furnace at its Gary, Indiana, facility.

130.    Ultimately, U.S. Steel operated its United States mills at only 67% of capacity in the fourth quarter of 2006.

131.    Nucor operated its United States mills at approximately 92% of capacity in the first three quarters of 2006 before cutting production to approximately 81% of capacity in the fourth quarter of 2006.

132.    In discussing the industry's fourth quarter 2006 downtime, Nucor explained that, "Similar to past experience, the more disciplined and profit driven flatrolled industry is appropriately focused on pacing supply to match consumer demand."

133.    Accordingly, Nucor joined its competitors in taking downtime and publicly discussed its "production discipline during the fourth quarter." Nucor curtailed steel sheet production by at least 15% in the fourth quarter of 2006, which according to Nucor "provided a more stable pricing environment."

134.    Like mid-2005, Steel Dynamics participated by taking mill downtime in the fourth quarter of 2006. Steel Dynamics reported that "in the fourth quarter, Steel Dynamics, as well as other domestic producers, cut back significantly on production."

-26-

135. Gerdau Ameristeel also cut production at several of its United States mills in the fourth quarter of 2006 for the purpose of reducing supply.

136. With respect to steel bar and other "long" products, Gerdau Ameristeel cut output by at least 10% in the fourth quarter of 2006 relative to the third quarter of 2006.

137. With respect to steel sheet and other "flat" products, Gerdau Ameristeel cut production by "considerably more than 10%" in the fourth quarter of 2006 relative to the third quarter of 2006.

138. Gerdau Ameristeel estimated that it operated its United States mills at only 60% of capacity in the fourth quarter of 2006.

139. AK Steel participated in the industry's late-2006 downtime, operating "somewhere on average about 8% below our total capacity." Like its competitors, AK Steel explained that it cut production because "I don't think that really we are interested in getting supply and demand out of balance."

140. Commercial Metals participated in the late-2006 downtime. According to Commercial Metals, it operated at only 75-80% of capacity in the fourth quarter of 2006 and did so for the purpose of reducing supply in the marketplace. Commercial Metals also explained that U.S. mills were "disciplined with their outages" in late-2006.

141. IPSCO participated in the late-2006 downtime. On October 16, 2006, IPSCO announced mill curtailments, "falling in line with other companies that are taking similar action."

142. An industry analyst concluded that "Supply discipline on the part of the mills is being imposed much more quickly than it was last year. . . The announcement by Mittal to indefinitely idle two blast furnaces represents the final piece of a supply discipline scenario unfolding over the past

-27-

several weeks, an almost immediate response to higher-than-normal service center inventories . . . The breadth of this discipline is exceptionally encouraging[.]"

143.     On October 18, 2006, a steel industry analyst reported that "U.S. mills have reacted quickly . . . cutting production and moving up maintenance outages to take steel out of the system."

144.     Another industry analyst noted that Mittal had been successful in "encouraging [its United States] peer group to take some downtime in Q4 to clear up the inventory."

145.     Like mid-2005, the industry's late-2006 and early-2007 downtime was against each participating Defendant's competitive self-interest, absent a conspiracy. At all relevant times during the conspiracy period: (a) annual domestic demand for steel exceeded available domestic supply and (b) the prevailing market price for steel was substantially higher than Defendants' marginal cost of production. Accordingly, in a competitive marketplace, Defendants would have operated their mills at a profit, and competed for market share, rather than curtailing production and taking costly market downtime.

146.     United States manufacturers and other direct purchasers suffered steel supply shortages following the industry's late-2006 and early-2007 downtime.  For example, in August 2007, a group of domestic auto parts manufacturers appeared before the ITC to testify on behalf "of the many American hot-rolled steel purchasers that are being squeezed by the steel mills' market domination and shortening of supply . . . all to the benefit of foreign auto parts makers."

147.     Market pricing stabilized after the late-2006 and early-2007 industry downtime.  For example, the benchmark price of hot-rolled steel sheet rallied from approximately $510/ton in January 2007 to approximately $580/ton in March 2007.

-28-

148.    Nucor CEO Dan DiMicco remarked in early-2007 that the industry had displayed "more profit driven discipline than ever before in my 30 plus years in the industry."

149.    On or about February 21, 2007, ArcelorMittal CEO Lakshmi Mittal stated that when "[w]e had softness in the U.S. market, the industry was able to restrict production to keep prices stable."

150.    In May 2007, ArcelorMittal reported that "most important are the prices and we see that the prices in North America have rebounded nicely in response to our industry's earlier production cut and are currently stable."

151.    At a trade meeting in mid-2007, Mr. Mittal called on fellow producers to "take a moment to enjoy" the industry's turnaround, explaining: "We have successfully made considerable progress in consolidation. We have successfully demonstrated the benefits that a more consolidated industry creates. We have successfully demonstrated our ability to better manage supply and demand."

152.    On May 9, 2007, a group of seven leading steel executives met in Pittsburgh, Pennsylvania, to discuss their industry's "new operating model and the benefits of consolidation." Participants included Leonard Chuderewicz, Executive Vice President of Mittal Steel USA; Larry T. Brockway, Vice President and Treasurer of U.S. Steel; Giffin F. Daughtridge, Vice President at Nucor; Mark D. Millet, Executive Vice President of Steel Dynamics; and Joseph D. Russo, Senior Vice President at IPSCO. This group discussed the industry's successful downtime in the fourth quarter of 2006 – including Mittal's "decision to shut down three blast furnaces" and U.S. Steel's decision to operate "at 67 percent capacity" – and praised supply restriction as "a new industry operating model" and one of the "main reasons for optimism about the steel industry's future."

-29-

153.     At another trade meeting in New York in June 2007, ArcelorMittal executive Louis Schorsch addressed competing executives (including the CEOs of Nucor, U.S. Steel and Steel Dynamics) and praised the industry's "disciplined" supply strategy. In yet another explicit call for industry collusion, Mr. Schorsch stated that, "the steel mills have to work to remain sustainable, and they need to adjust their production rates so the price of steel doesn't drop." Other steel leaders attending this meeting agreed that "they all need to work together to keep the prices high."

154.     At the same meeting, Nucor CEO Dan DiMicco addressed competing executives and explained that "when steel makers are tempted by the market and therefore fluctuate their prices, the growth in the industry will quickly decline."

155.     At the same meeting in June 2007, Steel Dynamics CEO Keith Busse commented that the industry had "entered a new age" characterized by "market discipline."

156.     In the wake of these calls to cut production and maintain industry "discipline," Defendants including ArcelorMittal, U.S. Steel, Nucor, Steel Dynamics, AK Steel and Commercial Metals collectively scaled back production, yet again, in mid-2007.

157.     Once again, these industry-wide curtailments were against Defendants' individual competitive interest and artificially inflated the market price of steel. As an executive from Steel Dynamics explained in October 2007, the industry's "market discipline" in *mid-2007—I. e.,* "mills reducing production"—facilitated another round of price increases later that year.

158.     In addition, an October 2007 statement from Steel Dynamics CEO Keith Busse reflects that producers were coordinating not only on output, but also on price.   Mr. Busse

-30-

complained that "[t]here are some folks out there who are speaking with a forked tongue... They raised the prices and then backed off. That hurt us in some areas, but we didn't do it. We held the line."

159.    Defendants' conspiracy remains ongoing through the present. As steel prices continued their ascent and reached record highs in 2008, Defendants continued to limit production artificially and cooperatively. Commenting on another round of supply restriction imposed by Defendants in mid-2008, experienced steel market analysts reported that "increased supply discipline" over the summer months allowed Defendants to announce price increases effective in August and September 2008.

160.    A *Business* Week profile of Lakshmi Mittal aptly summarized the state of the market and the cooperative production discipline imposed by Mittal and other major producers: "In the long run Lakshmi's vision is an industry dominated by a handful of powerful companies, strong enough to cut output rather than prices in a downturn."

161.    The conspiracy outlined above was exceptionally profitable for Defendants.

162.    Nucor, for example, reported record operating earnings of approximately $2.1 billion in 2005, followed by $2.2 billion in 2006 and $1.9 billion in 2007. Nucor's stock value more than tripled from approximately $25/share at the beginning of 2005 to a high of $83/share in 2008.

163.    U.S. Steel enjoyed its "second highest earnings on record" in 2005, with reported operating income of approximately $1.4 billion, followed by $1.78 billion in 2006, and $1.2 billion in 2007. U.S. Steel's stock value nearly quadrupled from approximately $50/share at the beginning of 2005 to a high of $196/share in 2008.

-31-

164. Other Defendants enjoyed equally impressive returns, commensurate with their respective market shares.

165. As Lakshrni Mittal summarized at an industry trade meeting in June 2008, "We have succeeded in transforming ourselves into a profitable and sustainable industry."

166. The ongoing activities described above have been engaged in by Defendants and their Co-Conspirators for the purpose of effectuating the unlawful arrangements to restrict output and to fix, maintain, raise or stabilize prices of steel products.

167. Defendants' unlawful cooperation with respect to the production and supply of raw steel allowed Defendants to impose substantial (and often strikingly parallel) price increases and raw material surcharges during the conspiracy period.

168. In addition, implementation and monitoring of the conspiracy was facilitated by Defendants' public and private dissemination of output, supply and pricing information.

169. For example, certain Defendants published production and/or capacity utilization information in their quarterly and annual reports, and in press releases.

170. Similarly, the AISI trade association facilitated implementation and monitoring of the conspiracy by compiling, *inter alia,* detailed output and/or capacity utilization information and by maintaining a members-only website that published, *inter alia,* detailed output and/or capacity utilization information.

171. World Steel Dynamics, a steel consulting firm, likewise published supply, demand, cost and output data that facilitated implementation and monitoring of the conspiracy.

172. In addition, the Metals Service Center Institute ("MSCI") published steel inventory data that facilitated implementation and monitoring of the conspiracy.

-32-

173.    During the Class Period, Defendants increased the prices for steel products and earned unusual and supra-competitive profits as a result of their anti-competitive conduct.

## IX.    CLAIMS FOR RELIEF

### COUNT I

### VIOLATION OF TENNESSEE TRADE PRACTICES ACT: COMBINATION AND CONSPIRACY BY DEFENDANTS TO FIX PRICES

174.    Plaintiff hereby adopts and incorporates by reference as if fully rewritten herein the allegations in the foregoing paragraphs of the Complaint.

175.    As set forth herein, Defendants engaged in a multitude of continuing contracts, combinations or conspiracies with respect to the sale of steel products in unreasonable restraint of trade and commerce and in violation of the Tennessee Trade Practices Act, Tennessee Code Annotated ("Tenn. Code Ann.") § 47-25-101, et seq.

176.    Defendants have combined and conspired to restrain trade in the market for steel products through concerted action, and have succeeded in unreasonably restraining trade in the market. There is no efficiency or other pro-competitive justification for the joint and collusive action of Defendants.

177.    As a direct and proximate result of Defendants' unlawful conspiracy and combination, open and fair competition has been unreasonably restrained, leading to diminished consumer choice, reduced innovation and artificially elevated prices, and Plaintiff and other consumers have suffered and will continue to suffer injury to their business and property.

178.    The unlawful conspiracy has had at least the following effects: (a) prices charged by Defendants and their Co-Conspirators to Plaintiff and the members of the Class for steel products

-33-

were artificially fixed, raised, stabilized and maintained at artificially high and non-competitive levels; (b) Plaintiff and the other members of the Class had to pay more for steel products than they would have paid in a competitive marketplace, unfettered by Defendants' and their Co-Conspirators' collusive and unlawful activities; (c) competition in the sale of steel products was restrained, suppressed and eliminated in Tennessee.

179.    Defendants have entered into unlawful agreements in restraint of trade in violation of the TTPA, which permits any person injured, such as Plaintiff and other Class members, to seek redress for their injuries arising out of illegal agreements, combinations, trusts, or conspiracies.

180.    During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce and caused injury to consumers in Tennessee.

181.    Plaintiff and members of the Class have been injured in their business and property by reason of Defendants' unlawful combinations, contracts, and conspiracies.

182.    Plaintiff and Class members have paid more for steel products than they otherwise would have paid for them in the absence of Defendants' conduct. This injury is of the type the TTPA was designed to prevent and flows from that which makes Defendants' conduct unlawful.

183.    Defendants' contracts, combinations and conspiracies to fix, raise, maintain, or stabilize the prices of steel products had the following substantial effects on Tennessee commerce:

- the price of steel products purchased in Tennessee was fixed, raised, maintained, or stabilized at inflated, artificial and non-competitive levels;

- consumers in Tennessee were deprived of free and open competition;

- competition was restrained in Tennessee; and

-34-

- consumers in Tennessee paid higher prices for steel products than they would have paid absent Defendants' conspiracy.

184. By reason of Defendants' violations of the TTPA, Plaintiff and the Class members paid significantly more for steel products than they would have paid in the absence of Defendants' illegal contracts, combinations and conspiracies and, as a result, Plaintiff and other Class members have suffered damages in amounts presently undetermined.

185. Defendants' conspiracies substantially affected Tennessee commerce as follows:

- Substantial Effects on Tennessee Trade or Commerce: Defendants' conduct was far-reaching and substantially affected Tennessee. Steel products were purchased by thousands of consumers in Tennessee, in all segments of society.

- The Substantial Monetary Effect on Tennessee Trade or Commerce: Defendants' conduct lasted several years and over that time, a substantial amount of steel products were sold in Tennessee.

- The Substantially Harmful Effect on the Integrity of the Tennessee Market: the Tennessee market is vulnerable and can be manipulated by conspirators either from outside Tennessee, inside Tennessee, or both. Without enforcing Tennessee's antitrust law to its fullest extent, companies that break the law will remain unpunished, and they will remain able to prey upon Tennesseans without consequence. The purpose of Tennessee's antitrust laws is to protect the state's trade and commerce affected by anti-competitive conduct. Defendants have shattered this very purpose by illegally and criminally victimizing the market. Thus, every level of the market's integrity has been compromised, from the manufacturer to the middlemen to the consumer.

-35-

- Length of Substantial Effect on Tennessee Commerce: some agreements, combinations, or conspiracies are short-lived. These lasted for several years, providing Defendants with illegal profits and permitting Defendants' to continue their victimization of consumers and substantially affect Tennessee commerce.

## COUNT II

## UNJUST ENRICHMENT

186. Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this complaint.

187. Defendants have benefitted from their unlawful acts through the overpayments for steel products by Plaintiff and the other Class members.

188. It would be inequitable for Defendants to be permitted to retain the benefit of these overpayments that were conferred by Plaintiff and the Class and retained by Defendants.

189. By reason of its unlawful conduct, Defendants should make restitution to Plaintiff and the Class. To the extent Plaintiff is required to have exhausted administrative remedies before bringing an unjust enrichment claim, exhaustion of any such remedies is not required in this instance because: (a) the issues are of the type that would be appropriate for judicial determination, and (b) applying the doctrine here would result in substantial financial hardship, inequity and economic inefficiency and would violate public policy. Further, any action which might have been taken by Plaintiff to pursue administrative remedies would have been futile.

190. In equity, Defendants should not be allowed to retain the economic benefit derived from said improper conduct and should be ordered to pay restitution and pre-judgment interest to Plaintiff and Class members.

-36-

## X.  FRAUDULENT CONCEALMENT

191.  Plaintiff and members of the Class did not discover, and could not discover through the exercise of reasonable diligence, the existence of the Defendants' conduct and the conspiracies alleged herein until 2009.

192.  Because Defendants' agreements, understandings, and conspiracies were kept secret, Plaintiff and members of the Class were unaware of Defendants' unlawful conduct alleged herein, and they did not know before 2009 that Plaintiff and the Class members had been injured.

193.  None of the facts or information available to Plaintiff, if investigated with reasonable diligence, could or would have led to the discovery of the wrongful conduct of the Defendants alleged herein prior to 2009.

194.  As a result of Defendants' fraudulent concealment of their conduct, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and members of the Class have alleged in this Complaint.

## XI.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that:

A.  That the summons be issued and that Defendants be duly served with a copy of this Complaint and required to answer same, and that this Court decree and enter judgment.

B.  That the Court certify the Class and appoint the Plaintiff as representative of the Class;

C.  That the Court award compensatory damages to Plaintiff and Class resulting from the various acts of wrongdoing under the common and statutory laws of Tennessee, in such amounts as represent the losses reasonably suffered by Plaintiff and Class;

-37-

D.  That the Court decree that Defendants have violated Tennessee common law and the Tennessee Trade Practices Act and award Plaintiff and Class appropriate damages and relief;

E.  That the Court award Plaintiff its reasonable costs;

F.  That the Court decree that Defendants have been unjustly enriched by their wrongful conduct, and award restitution to Plaintiff and the Class;

G.  That the Court award Plaintiff and the Class all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity;

H.  That the Court order such other, further and general relief as is just and proper.

Respectfully submitted, this 22nd day of December, 2010.


W. Gordon Ball, Esq., BPR # 001135
**BALL & SCOTT LAW OFFICES**
550 West Main Street, Suite 601
Knoxville, Tennessee 37902
Telephone: 865.525.7028
Fax: 865.525.4679

-38-

## COST BOND

We, the undersigned principal and surety, hereby bind ourselves to secure the costs of this action.

Principal:     Beville H. Reagan

By:

Gordon Ball

Ball & Scott Law Offices
550 West Main Street, Suite 601
Knoxville, Tennessee 37902
Telephone: 865.525.7028
Fax: 865.525.4679

Surety:

Gordon Ball

-39-

**BEVILLE H. REAGAN, individually, and
on behalf of all others similarly situated,**

     **Plaintiffs,**

**vs.**

**ArcelorMittal, et al.**

     **Defendants.**

**Civil Summons**

No. _32,321_ –

### SUMMONS

**To:**    **STEEL DYNAMICS, INC., 7575 W. JEFFERSON BLVD., FORT WAYNE, IN 46804 USA
Attention: Keith Busse, Chairman & Chief Executive Officer**

You are hereby summoned and required to serve upon Gordon Ball, plaintiff's attorney, whose address is 550 Main Street, Suite 601, Knoxville, TN 37902, an answer to the complaint, which is herewith served upon you, within thirty (30) days after service of this summons upon you, exclusive of the day of service, and file a copy of the answer with this court within 30 days after answer is made. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

Witness, _Peggy W. Lane_ _Circuit Court Clerk_ of said Court, at office, the _1st_ day of _September_ , 20_10_.

Issued this _28th_ day of _December_ , 20_10_.

Peggy Lane, Clerk

By: _Kristi L. Pease_

    Deputy Clerk

      Received this _____ day of _____, 20__.

STATE OF TENNESSEE, COCKE COUNTY
I, Peggy W. Lane, Clerk of the Circuit Court of
Cocke County, Tennessee, certify that the foregoing
is a true copy of the original bill filed in this cause.
Witness my hand and official seal of office on this
_28th_ day of _December_ , 20_10_
_Peggy W. Lane_
Circuit Court Clerk

_____
Deputy Sheriff

**NOTICE to the Defendant(s):**

**Tennessee law provides a four thousand dollar ($4,000.00) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you with to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary, however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.**

### RETURN ON SERVICE OF SUMMONS

I hereby certify and return that on the _____ day of _____, 20__, I served this summons together with a copy of the complaint herein as follows:

_____

_____

ADA
FOR ASSITANCE CALL
423-623-8791 EXT 24

                        Deputy Sheriff

**THIS SUMMONS IS ISSUED PURSUANT TO RULE 4 OF THE TENN. R. CIV. PRO.**

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X  *Erick a Frey*          ☐ Agent
                            ☐ Addressee
B. Received by (Printed Name)   JAN 0 2011    C. Date of Delivery

RECEIVED

JAN 14 2011

COCKE COUNTY
CIRCUIT COURT

1. Article Addressed to:

Arcelormittal USA Inc.
CT Corporation System Agent Address:
800 S Gay Street, Suite 2021
Knoxville, TN 37929

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☐ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)     7003 2260 0006 9683 7249

PS Form 3811, February 2004       Domestic Return Receipt       102595-02-M-1540

CT Corporation System Agent Address: 800 S Gay Street, Suite 2021, Knoxville, TN 37929 USA

You are hereby summoned and required to serve upon Gordon Ball, plaintiff's attorney, whose address is 550 Main Street, Suite 601, Knoxville, TN 37902, an answer to the complaint, which is herewith served upon you, within thirty (30) days after service of this summons upon you, exclusive of the day of service, and file a copy of the answer with this court within 30 days after answer is made. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

Witness, *Peggy W. Lane* *Circuit Court Clerk* of said Court, at office, the 1st day of *September*, 2010.

Issued this 28th day of *December*, 2010.

Peggy Lane, Clerk

By: *Kristy L. Nease*
    Deputy Clerk

Received this ___ day of *May*, 2011.
                                        *Deputy Sheriff*

**NOTICE to the Defendant(s):**

Tennessee law provides a four thousand dollar ($4,000.00) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary, however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

**RETURN ON SERVICE OF SUMMONS**

I hereby certify and return that on the 12th day of *May*, 2011, I served this summons together with a copy of the complaint herein as follows:

*by Certified mail, return receipt request delivered on January 10, 2011, as referenced on the attached return receipt*   *Deputy Sheriff*

**THIS SUMMONS IS ISSUED PURSUANT TO RULE 4 OF THE TENN. R. CIV. PRO.**

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X *S. Borton*  ☐ Agent  ☐ Addressee<br>B. Received by ( Printed Name)  C. Date of Delivery<br>S. BORTON  1-7-11<br>D. Is delivery address different from item 1?  ☐ Yes<br>If YES, enter delivery address below:  ☐ No |
| 1. Article Addressed to:<br><br>Steel Dynamics, Inc.<br>7575 W. Jefferson Blvd.,<br>Fort Wayne, IN 46804<br>Attention: Keith Busse,<br>Chairman & Chief Officer | 3. Service Type<br>☑ Certified Mail  ☐ Express Mail<br>☐ Registered  ☑ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D.<br>4. Restricted Delivery? (Extra Fee)  ☐ Yes |
| 2. Article Number<br>(Transfer from service label) | 7003 2260 0006 9683 7195 |
| PS Form 3811, February 2004 | Domestic Return Receipt  102595-02-M-1540 |

RECEIVED

JAN 14 2011

COCKE COUNTY
CIRCUIT COURT

3232

21 -

Attention: Keith Busse, Chairman & Chief Executive Officer ............ WAYNE, IN 46804 USA

You are hereby summoned and required to serve upon Gordon Ball, plaintiff's attorney, whose address is 550 Main Street, Suite 601, Knoxville, TN 37902, an answer to the complaint, which is herewith served upon you, within thirty (30) days after service of this summons upon you, exclusive of the day of service, and file a copy of the answer with this court within 30 days after answer is made. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

Witness, _Peggy W. Lane_ _Circuit Court Clerk_ of said Court, at office, the _1st_ day of _September_, 2010.

Issued this _28th_ day of _December_, 2010.

Peggy Lane, Clerk

By: _Kristi L. Nease_
Deputy Clerk

Received this _5th_ day of _January_, 2011

_[signature] Benson_
Deputy Sheriff

**NOTICE to the Defendant(s):**

Tennessee law provides a four thousand dollar ($4,000.00) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary, however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

**RETURN ON SERVICE OF SUMMONS**

I hereby certify and return that on the _7th_ day of _January_, 2011, I served this summons together with a copy of the complaint herein as follows:

_by certified mail, return receipt requested, delivered on January 7, 2011_
_as referenced on the attached return receipt_  _[signature] Benson_
Deputy Sheriff

**THIS SUMMONS IS ISSUED PURSUANT TO RULE 4 OF THE TENN. R. CIV. PRO.**

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

United States Steel Corporation
National Registered Agents, Inc.
2300 Hillsboro Road, Suite 305
Nashville, TN 37212

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X D Huberson ☐ Agent ☐ Addressee

B. Received by ( Printed Name ) C. Date of Delivery
D. Nickerson 1-7-11

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

32,321

3. Service Type
☑ Certified Mail ☐ Express Mail
☐ Registered ☑ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service label)
7003 2260 0006 9683 7225

PS Form 3811, February 2004       Domestic Return Receipt       102595-02-M-1540

2300 Hillsboro Road, Suite 305

Nashville, TN 37212 USA

You are hereby summoned and required to serve upon Gordon Ball, plaintiff's attorney, whose address is 550 Main Street, Suite 601, Knoxville, TN 37902, an answer to the complaint, which is herewith served upon you, within thirty (30) days after service of this summons upon you, exclusive of the day of service, and file a copy of the answer with this court within 30 days after answer is made. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

Witness, _Peggy W. Lane_ _Circuit Court Clerk_ of said Court, at office, the _1st_ day of _September_, 20_10_.

Issued this _28th_ day of _December_, 20_10_

Peggy Lane, Clerk

By: _Kristy L. Nease_
Deputy Clerk

Received this _5th_ day of _January_, 20_11_.

_[signature] Benson_
Deputy Sheriff

**NOTICE to the Defendant(s):**

Tennessee law provides a four thousand dollar ($4,000.00) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary, however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

**RETURN ON SERVICE OF SUMMONS**

I hereby certify and return that on the ___ day of _January_, 20_1_, I served this summons together with a copy of the complaint herein as follows:

_by certified return receipt requested, dated on Jan 7, 2011_
_as referenced on the attached receipt._

_[signature]_
Deputy Sheriff

**THIS SUMMONS IS ISSUED PURSUANT TO RULE 4 OF THE TENN. R. C).**

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|

**SENDER: COMPLETE THIS SECTION**
- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent ☐ Addressee

B. Received by (Printed Name) — DIXSON   C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered   ☑ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

RECEIVED
JAN 14 2011
COCKE COUNTY
CIRCUIT COURT

1. Article Addressed to:

Commercial Metals Company
6565 N. MacArthur Blvd., Suite 800
Irving, Texas 75039
Attention: Murray R. McClean,
Chairman, President & CEO

2. Article Number
(Transfer from service label)   7003 2260 0006 9683 7188

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540

Attention: **Murray R. McClean, Chairman, President, & CEO**

You are hereby summoned and required to serve upon Gordon Ball, plaintiff's attorney, whose address is 550 Main Street, Suite 601, Knoxville, TN 37902, an answer to the complaint, which is herewith served upon you, within thirty (30) days after service of this summons upon you, exclusive of the day of service, and file a copy of the answer with this court within 30 days after answer is made. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

Witness, *Peggy W. Lane* Circuit Court Clerk of said Court, at office, the 1st day of *September*, 2010.

Issued this 28th day of *December*, 2010.

Peggy Lane, Clerk

By: *Kristy L. Nease*
Deputy Clerk

Received this ___ day of *January*, 2011

Deputy Sheriff

**NOTICE to the Defendant(s):**

Tennessee law provides a four thousand dollar ($4,000.00) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you with to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary, however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

**RETURN ON SERVICE OF SUMMONS**

I hereby certify and return that on the ___ day of *January*, 2011, I served this summons together with a copy of the complaint herein as follows:

by certified mail return receipt required, delivered on January 7, 2011 as reference on the attached receipt

Deputy Sheriff

**THIS SUMMONS IS ISSUED PURSUANT TO RULE 4 OF THE TENN. R. CIV. PRO.**

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete Item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X _____ ☐ Agent ☐ Addressee<br>B. Received by ( Printed Name ) C. Date of Delivery |
| 1. Article Addressed to:<br><br>AK Steel Corporation<br>Corporation Service Company<br>2908 Poston Ave,<br>Nashville, TN 37203 | D. Is delivery address different from item 1? ☐ Yes<br>If YES, enter delivery address below: ☐ No<br><br>JAN _ 7 2011 |
| | 3. Service Type<br>☑ Certified Mail ☐ Express Mail<br>☐ Registered ☑ Return Receipt for Merchandise<br>☐ Insured Mail ☐ C.O.D. |
| | 4. Restricted Delivery? (Extra Fee) ☐ Yes |
| 2. Article Number<br>(Transfer from service label) | 7003 2260 0006 9643 7201 |

PS Form 3811, February 2004     Domestic Return Receipt     102595-02-M-1540

RECEIVED
JAN 14 2011
COCKE COUNTY
CIRCUIT COURT

62,34

**CORPORATION SERVICE COMPANY, 2908 POSTON AVE, Nashville, TN 37203 USA**

You are hereby summoned and required to serve upon Gordon Ball, plaintiff's attorney, whose address is 550 Main Street, Suite 601, Knoxville, TN 37902, an answer to the complaint, which is herewith served upon you, within thirty (30) days after service of this summons upon you, exclusive of the day of service, and file a copy of the answer with this court within 30 days after answer is made. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

Witness, _Peggy W. Lane_ _Circuit Court Clerk_ of said Court, at office, the _1st_ day of _September_, 20 _10_

Issued this _28th_ day of _December_, 20 _10_

Peggy Lane, Clerk

By: _Kristi L. Neace_

Deputy Clerk

Received this ___ day of _January_, 20 _11_.

_Deputy Sheriff_

**NOTICE to the Defendant(s):**

Tennessee law provides a four thousand dollar ($4,000.00) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary, however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

**RETURN ON SERVICE OF SUMMONS**

I hereby certify and return that on the _10th_ day of _January_, 20 _11_, I served this summons together with a copy of the complaint herein as follows:

_by Certified mail, return receipt requested, dated on January 7, 2011_
_as referenced on the outside receipt._

_Deputy Sheriff_

**THIS SUMMONS IS ISSUED PURSUANT TO RULE 4 OF THE TENN. R. CIV. PRO.**

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

SSAB Swedish Steel Corporation
dba SSAB Enterprises, LLC
650 Warrenville Road, Suite 500
Lisle, Illinois 60532
Attention: David Britten, President

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _T BURNS_ ☐ Agent ☐ Addressee

B. Received by ( Printed Name) _T BURNS_ C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail ☐ Express Mail
☐ Registered ☑ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service lab) 7003 2260 0006 9683 7171

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540

---

SSAB SWEDISH STEEL CORPORATION dba SSAB Enterprises, LLC
650 Warrenville Road, Suite 500, Lisle, Illinois 60532
**Attention: David Britten, President**

You are hereby summoned and required to serve upon Gordon Ball, plaintiff's attorney, whose address is 550 Main Street, Suite 601, Knoxville, TN 37902, an answer to the complaint, which is herewith served upon you, within thirty (30) days after service of this summons upon you, exclusive of the day of service, and file a copy of the answer with this court within 30 days after answer is made. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

Witness, _Peggy W. Lane_ _Circuit Court Clerk_ of said Court, at office, the _1st_ day of _December_, 2010.

Issued this _28th_ day of _December_, 2010.

Peggy Lane, Clerk

By: _Kristi L. Nease_
Deputy Clerk

Received this _3rd_ day of _January_, 201_.

_Deputy Sheriff_

**NOTICE to the Defendant(s):**

Tennessee law provides a four thousand dollar ($4,000.00) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you with to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary, however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

**RETURN ON SERVICE OF SUMMONS**

I hereby certify and return that on the _13th_ day of _January_, 2011, I served this summons together with a copy of the complaint herein as follows:

_by certified mail return receipt requested delivered on Jan 11, 2011,_
_as referred on the attached return receipt_

_Deputy Sheriff_

**THIS SUMMONS IS ISSUED PURSUANT TO RULE 4 OF THE TENN. R. CIV. PRO.**

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent  ☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery

JAN 7 2011

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

1. Article Addressed to:

Gerdau Ameristeel US Inc.;
Corporation Service Company
2908 Poston Ave.
Nashville, TN 37203

3. Service Type
   ☐ Certified Mail  ☐ Express Mail
   ☐ Registered  ☐ Return Receipt for Merchandise
   ☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
   (Transfer from service label)

7003 2260 0006 9683 7218

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540

RECEIVED

JAN 14 2011

COCKE COUNTY
CIRCUIT COURT

**CORPORATION SERVICE COMPANY, 2908 POSTON AVE, Nashville, TN 37203 USA**

You are hereby summoned and required to serve upon Gordon Ball, plaintiff's attorney, whose address is 550 Main Street, Suite 601, Knoxville, TN 37902, an answer to the complaint, which is herewith served upon you, within thirty (30) days after service of this summons upon you, exclusive of the day of service, and file a copy of the answer with this court within 30 days after answer is made. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

Witness _Peggy N. Lane_ _Circuit Court Clerk_ of said Court, at office, the _1st_ day of _September_, 20_10_.

Issued this _28th_ day of _December_, 20_10_.

Peggy Lane, Clerk

By: _Kristy L. Nease_

Deputy Clerk

Received this _5th_ day of _January_, 2011. _Deborah Benson_

Deputy Sheriff

**NOTICE to the Defendant(s):**

Tennessee law provides a four thousand dollar ($4,000.00) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you with to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary, however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

**RETURN ON SERVICE OF SUMMONS**

I hereby certify and return that on the _12th_ day of _January_, 20_11_, I served this summons together with a copy of the complaint herein as follows:

_by Certified mail return receipt requested, delivered on January 17, 2011_
_as referenced on the attached receipt._

_Deborah Benson_

Deputy Sheriff

**THIS SUMMONS IS ISSUED PURSUANT TO RULE 4 OF THE TENN. R. CIV. PRO.**

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

JAN ___ 2011

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

1. Article Addressed to:

Nucor Corporation
CT Corporation System
800 S Gay Street, Suite 2021
Knoxville, TN 37929

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered        ☑ Return Receipt for Merchandise
☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)

7003 2260 0006 9683 7232

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

sscc

RECEIVED

JAN 14 2011

COCKE COUNT
CIRCUIT COURT

Nucor Corporation, CT Corporation System, 800 S Gay Street, Suite 2021, Knoxville, TN 37929 USA

You are hereby summoned and required to serve upon Gordon Ball, plaintiff's attorney, whose address is 550 Main Street, Suite 601, Knoxville, TN 37902, an answer to the complaint, which is herewith served upon you, within thirty (30) days after service of this summons upon you, exclusive of the day of service, and file a copy of the answer with this court within 30 days after answer is made. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

Witness, _Peggy W. Lane_ _Circuit Court Clerk_ of said Court, at office, the _1st_ day of _September_, 20_10_

Issued this _28th_ day of _December_, 20_10_

Peggy Lane, Clerk

By: _Kristy L. Reese_
Deputy Clerk

Received this _5th_ day of _May_, 20_11_

_____
Deputy Sheriff

**NOTICE to the Defendant(s):**

Tennessee law provides a four thousand dollar ($4,000.00) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you with to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary, however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

**RETURN ON SERVICE OF SUMMONS**

I hereby certify and return that on the _12th_ day of _January_, 20_11_, I served this summons together with a copy of the complaint herein as follows:

_by certified mail, return receipt requested, delivered on January 6, 2011, as referenced on the attached return receipt._

_____
Deputy Sheriff

**THIS SUMMONS IS ISSUED PURSUANT TO RULE 4 OF THE TENN. R. CIV. PRO.**